TRUSTEES OF THE OPERATING
ENGINEERS' LOCAL 324 PENSION
FUND,

      Plaintiff,                      Case No. 2:15-cv-12272

v.                                 HONORABLE STEPHEN J. MURPHY, III

BOURDOW CONTRACTING, INC.,

      Defendant.

_____/

## OPINION AND ORDER DENYING
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [28]
## AND GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [29]

Plaintiff, a pension fund, brought the instant withdraw-liability claim pursuant to the Employee Retirement Income Security Act (ERISA). Plaintiff argues that Defendant, a construction company, is in fact the alter ego of a now-defunct predecessor company. Defendant denied the claim and the two parties have filed cross motions for summary judgment. The Court has reviewed the initial and supplementary briefs and determined that a hearing is unnecessary. *See* E.D. Mich. LR 7.1(f). For the following reasons, the Court will deny Defendant's motion and grant Plaintiff's motion.

## BACKGROUND

I.    <u>Fringe Benefits and Withdrawal Liability Under ERISA and the MPPAA</u>

Congress passed ERISA in 1974. One of the principal purposes of ERISA "was to ensure that employees and their beneficiaries would not be deprived of anticipated retirement benefits by the termination of pension plans before sufficient funds have been accumulated in the plans." *Pension Ben. Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 720 (1984). But soon after its passage, Congress recognized that certain problems

might arise concerning multiemployer plans and passed an additional act: the Multiemployer Pension Plan Amendments Act of 1980 (MPPAA). The MPPAA:

> requires that an employer withdrawing from a multiemployer pension plan pay a fixed and certain debt to the pension plan. This withdrawal liability is the employer's proportionate share of the plan's "unfunded vested benefits," calculated as the difference between the present value of vested benefits and the current value of the plan's assets.

*Id.* at 725 (quoting 29 U.S.C. §§ 1381, 1391).

Congress also recognized "the transitory nature of contracts and employment in the building and construction industry" and therefore treated employers within that industry slightly differently. *Bd. of Trs., Sheet Metal Workers' Nat'l. Pension Fund v. Palladium Equity Partners, LLC*, 722 F. Supp. 2d 854, 873 (E.D. Mich. 2010) (citing *Carpenters Pension Tr. Fund for N. Cal. v. Underground Constr. Co.*, 31 F.3d 776, 778 (9th Cir.1994). Under the MPPAA's construction-industry exception, a withdrawal occurs only if the employer "ceases to have an obligation to contribute under the plan," yet "continues to perform work in the jurisdiction of the collective bargaining agreement of the type for which contributions were previously required," or "resumes such work within 5 years after the date on which the obligation to contribute under the plan ceases, and does not renew the obligation at the time of the resumption." 29 U.S.C. § 1383(b)(2).

II.  Bourdow Trucking: 1967–2013

Bourdow Trucking Company ("Trucking") was incorporated in 1967. ECF 29, PgID 529, ¶ 1. Its incorporators and original board of directors included Daniel Bourdow, Sr., Thomas Marx, and Mary Kruske, ECF 39-1, PgID 559. By 2012, the company was owned by four shareholders, all members of the Bourdow family. Dan Sr. and Patricia

Bourdow—a married couple—each owned 30.7% of the company, and Dan Jr., Barb, Cindy, and Joe—their children—each owned 9.65%.[1] ECF 31, PgID 839–40. Dan Sr., Patricia, Dan Jr., and Joe also served as the company's officers, ECF 29-12, PgID 722. In addition to being officers, Dan Jr. and Joe also worked in supervisory roles, ECF 29-4, PgID 633; ECF 29-3, PgID 608, and other Bourdow family members worked for the company, too. For instance, Barb's husband Craig Kelly worked as an equipment operator from 1980 through 2012, ECF 29-15, 737, and Dan Jr.'s son Jason worked as a laborer, ECF 29-3, PgID 595.

Trucking sold dirt and gravel and did site preparation and excavation work within the Lower Penninsula for several decades. ECF 31, PgID 840. The Bourdow children grew up working for the company, some never working anywhere else, ECF 29-2, PgID 567; ECF 29-3, PgID 592–93; ECF 29-4, PgID 632, and for as long as Barb Kelly could remember, Trucking was bound to a collective bargaining agreement (CBA) with Local 324 (the Union), ECF 29-2, PgID 571. But the company encountered "financial difficulties" in 2007 and terminated its agreement with the Union. ECF 28, PgID 426; ECF 29-2, PgID 569; ECF 28-6, PgID 485–86. Trucking negotiated with the Union for some time, but they did not reach an agreement. ECF 29-2, PgID 572–73.

Despite the terminated CBA, Trucking's financial difficulties persisted. Around 2010, Trucking hired a CPA, Gregg Greenwood, to help Trucking address the financial problems. ECF 28-6, PgID 495. Greenwood attended Trucking's annual meetings and, according to him, in at least one meeting Joe and Dan Jr. seemed "disgruntled as to

---

[1] Throughout the exhibits and briefs, both parties refer to the Bourdows by these

how things were going" with Trucking. *Id.* at 496. Specifically, they seemed concerned about "the top-heaviness of the company"—for instance, Cindy was continuing to draw compensation and fringe benefits despite not actually working within the company. *Id.* at 496–97. Greenwood testified that Joe and Dan Jr. were "adamant in the meetings . . . that the company [could] no longer operate in this fashion without making decisive cuts." *Id.* at 496. But changes were never made. *Id.* at 497.

Although a CBA was no longer in effect, Trucking continued to remit fringe payments to the Union's pension fund (the Fund) into 2011. ECF 29-2, PgID 570–71; ECF 27-8, PgID 271. Barb testified that she continued to remit the funds "[b]ecause nobody told [her] to stop." ECF 29-2, PgID 570. Trucking eventually stopped paying fringes after the Fund sent back an uncashed check. *Id.* at 571, 573. All the while, Barb requested and received Trucking's withdrawal liability estimates. *Id.* at 575; ECF 29-6.

On August 27, 2012, Defendant Operating Engineers Local 324 Pension Fund ("the Fund") sent Trucking a letter. ECF 29-8. The subject read, "Notice of Complete Withdrawal and Demand for Payment of Withdrawal Liability." The letter explained that "[b]ased on information currently available" to the Fund, it had "determined that Bourdow Trucking Co. completely withdrew from the Fund on or about July 2011," resulting in an estimated withdrawal liability of $1,163,279. Accordingly, the letter laid out a payment schedule: Trucking was to pay 29 quarterly installments of $44,456.15, along with one final payment of $23,864.99. The first quarterly payment was due on November 1, 2012.

---

nicknames. For clarity and uniformity, the Court does likewise.

Some of the family members disagreed with the liability assessment, so a meeting was called. ECF 28-6, PgID 489. The shareholder Bourdows attended the meeting, as did Greenwood, David Masud (Trucking's longtime labor lawyer), and John Lozano (a bankruptcy lawyer recently hired by Trucking). ECF 29-2, PgID 580; ECF 27-3, PgID 187. Greenwood recalled the meeting lasted one to two hours and, by the end, everyone was aware of Trucking's withdrawal liability and agreed that they could not pay the assessed amount. ECF 29-9, PgID 696. Greenwood also recalled that three options were put forward: (1) liquidate the company, (2) file for bankruptcy, or (3) work with the Fund on a compromise. *Id.* 697. No decision was reached at the meeting. *Id.*

On September 5, 2012, Masud called Paula Johnson, the Plant Manager for the Fund. ECF 29-5, PgID 661–63. According to Johnson, Masud informed her that Trucking "was a small family-owned company and that they didn't have any resources to fight an assessment and that they were just going to wind down their business and shut their doors[,]" but "they were not interested in filing bankruptcy[.]"[2] ECF 29-5, PgID 661–62. Johnson referred Masud to the Fund's attorney, Nancy Pearce, and in a subsequent conversation with Pearce, Masud allegedly asked "if there was a way that the withdrawal liability assessment could be undone." *Id.* at 663. No reply to Masud's question is in the record.

Ultimately, Trucking failed to make its first payment on November 1, 2012 and the Fund referred the matter to outside counsel to pursue collection. ECF 28-6, PgID

---

[2] Trucking did not raise a hearsay objection during the deposition or in the briefs, so the Court considers Johnson's statements in full. *See Dole v. Zeta Enters., Inc.*, 940 F.2d 659 (6th Cir. 1991) (table).

499.The Fund then filed a lawsuit to recover the withdrawal liability payment later that month. *See Operating Eng'rs Local 324 Pension Fund v. Bourdow Trucking Co.*, Case No. 2:12-cv-15118. Trucking filed for bankruptcy on March 12, 2013, thereby automatically staying the lawsuit and halting Trucking's then-active road project. ECF 32-4, PgID 1044–46.

III.    Bourdow Contracting: 2012–present

Although Trucking was coming to an end in the f5all of 2012, a new Bourdow enterprise was beginning. Jason Bourdow signed the Articles of Organization for Defendant Bourdow Contracting, LLC ("Contracting") on October 29, 2012. ECF 32-11, PgID 1132. Lozano had prepared the documents and faxed them to the Michigan Department of Labor and Economic Growth on October 31, 2012; they were filed two days later. *Id.* at 1131. Under Contracting's operating agreement, Jason, Joe, and Dan Jr. each had a one-third interest. *Id.* at 1142. Dan Jr. explained that his "goal [in forming Contracting] was to keep working. I could not afford to retire so I had to keep working." ECF 27-3, PgID 192. Joe made a similar statement. ECF 29-4, PgID 657.

Contracting bid on its first project on March 10, 2013 and more work has followed. ECF 32-4, PgID 1048; ECF 32-12, PgID 1144. The work is similar to that of Trucking: 90% of Contracting's work is in site preparation and excavation. ECF 28-3, PgID 441. The company is small—3-8 employees, depending on workload—and serves customers in Saginaw, Bay, and Midland counties. *Id.* at 442.

## STANDARD OF REVIEW

Summary judgment is proper if there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material for purposes of summary judgment if its resolution would establish or refute an "essential element[] of a cause of action or defense asserted by the parties[.]" *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984).

In considering a motion for summary judgment, the Court must view the facts and draw all inferences in the light most favorable to the non-moving party. *Stiles ex rel. D.S. v. Grainger Cty., Tenn.*, 819 F.3d 834, 848 (6th Cir. 2016). The Court must then determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986). And although the Court may not make credibility judgments or weigh the evidence, *Moran v. Al Basit LLC*, 788 F.3d 201, 204 (6th Cir. 2015), a mere "scintilla" of evidence is insufficient to survive summary judgment; "there must be evidence on which the jury could reasonably find for the plaintiff," *Anderson*, 477 U.S. at 252.

## DISCUSSION

Trucking's bankruptcy meant that its withdrawal liability to the Fund—assessed at $1,163,279—went largely unpaid. The Fund now seeks to recover the liability payments from Contracting. The Fund argues that Contracting is actually the successor or alter-ego of Trucking and is therefore liable for the payments. Contracting denies this, and insists that the two companies are different in several important ways.

I.      Alter Ego Liability

A.      Actionability of Alter Ego Claims Under the MPPAA

"The alter ego doctrine was developed to prevent employers from evading obligations under the [National Labor Relations Act] merely by changing or altering their corporate form." *N.L.R.B. v. Allcoast Transfer, Inc.*, 780 F.2d 576, 579 (6th Cir. 1986). Courts in this district and elsewhere have concluded that alter ego claims arising from withdrawal liability are actionable under ERISA and the MPPAA. *See New Jersey Carpenters Pension Fund v. Hous. Auth. & Urban Dev. Agency of the City of Atl. City*, 68 F. Supp. 3d 545, 558 (D.N.J. 2014); *Bd. of Trs., Sheet Metal Workers' Nat'l. Pension Fund v. Palladium Equity Partners, LLC*, 722 F. Supp. 2d 854, 871 (E.D. Mich. 2010) (*Palladium*); *Brown v. Astro Holdings, Inc.*, 385 F. Supp. 2d 519, 532–33 (E.D. Pa. 2005) (recognizing actionability against alter egos of employers, but not entities under the employer's common control). As applied to the facts here, the Court finds the reasoning of these cases sound and concludes that an entity which is the alter ego to Trucking could be held liable for its withdrawal liability.

B.      The Test for Alter Ego Claims

The Sixth Circuit has adopted the case law of the National Labor Relations Board (NLRB) "for determining whether two companies are alter egos." *Trs. of Detroit Carpenters Fringe Benefit Funds v. Indus. Contracting, LLC*, 581 F.3d 313, 318 (6th Cir. 2009) (*Detroit Carpenters*). And when, as here, an alter-ego claim is rooted in an allegation that "the new employer is 'merely a disguised continuance of the old employer,'" courts apply a "relaxed" test. *N.L.R.B. v. Fullerton Transfer & Storage Ltd.,*

*Inc.*, 910 F.2d 331, 336 (6th Cir. 1990) (quoting *Southport Petroleum, Co. v. NLRB*, 315 U.S. 100, 106 (1942)). The relaxed application of the test asks "whether the two enterprises have substantially identical management, business, purpose, operation, equipment, customers, supervision and ownership." *Id.* (quoting *Nelson Elec. v. N.L.R.B.*, 638 F.2d 965, 968 (6th Cir.1981)). "[N]o individual factor is outcome determinative; instead, 'all the relevant factors must be considered together.'" *Detroit Carpenters*, 581 F.3d at 318 (quoting *Allcoast Transfer*, 780 F.2d at 582). Evidence of the employer's intent to evade labor obligations can be considered, *id.*, but a finding of intent is unnecessary, and an employer may be liable as an alter ego "even when a reorganization is supported by legitimate reasons," *Yolton v. El Paso Tenn. Pipeline Co.*, 435 F.3d 571, 587 n.14 (6th Cir. 2006), *abrogation on other grounds recognized by Cole v. Meritor, Inc.*, 855 F.3d 695, 699 (6th Cir. 2017); *see also Palladium*, 722 F. Supp. 2d at 871. The "essential inquiry" is "whether there was a *bona fide* discontinuance and a true change of ownership or merely a disguised continuance of the old employer." *Yolton*, 435 F.3d at 588 (alterations and citations omitted).

C.    The Test Applied

The Fund argues that when the above factors are applied to Trucking and Contracting, each factor reveals that Contracting is indeed the alter ego of Trucking. Contracting disagrees, and both parties' motions principally focus on the application of these factors to the facts, which are largely undisputed. The Court therefore takes each factor in turn to determine whom each factor tends to favor.

1.  Management

According to Barb Kelly, Dan Sr. was the sole manager of Trucking, while she and Lori Pagano assisted him with office operations including processing payroll, making customer calls, and running errands ECF 28-2, PgID 438. Barb and other family members repeated the refrain that Dan Sr. ultimately made all the big decisions and was the point of contact for Trucking's lawyers and accountant. ECF 29-2, PgID 572, 582; ECF 29-3, PgID 594–95; ECF29-4, PgID 635. Dan Sr. has no involvement in Contracting and there is uncontroverted evidence that Dan Sr. was the head of Trucking. The management factor therefore weighs in favor of Contracting.

2.  Business Purpose

Half of Trucking's business consisted in selling and trucking materials such as dirt, stone, and sand. ECF 28-2, PgId 437. The other half of the business was evenly split between site preparation and excavation. *Id.* Although Contracting does not sell or truck materials, 90% of its business is site preparation and excavation. ECF 28-3, PgID 441. In other words, except for a bit of snow plowing, Contracting does exclusively what Trucking used to do. The business-purpose factor therefore weighs in favor of the Fund.

3. Operations

Contracting makes much of the contrasting details of its operations versus Trucking's. It notes, for instance, that a third-party business cleaned Trucking's office, while Dan Jr. cleans Contracting's office. ECF 28, PgID 424. Similarly, Trucking employees used to maintain and repair the Trucking office building, while Dan Jr. repairs and maintains Contracting's office. *Id.* These details are hardly surprising:

Contracting is operated out of Dan Jr.'s home. *Id.* at 423. The Trucking building was sold to pay off creditors during the bankruptcy. *Id.* at 422–23.

Contracting also emphasizes the differences in who performs certain day-to-day tasks. Payroll, accounts, phone calls and errand-running at Trucking was done by Barb and Lori Pagano, *id.* at 423, but at Contracting, Jason (Barb's nephew) performs those tasks. And where Dan Sr. and Dan Jr. used to perform estimates and bid proposals for Trucking, now Dan Jr., Jason, and Joe do those things. *Id.*

That the functions of the two companies' employees can so seamlessly be compared to each other is itself telling. The operations of disparate construction companies are likely quite similar from one to the next, but on the facts before the Court, operations at Contracting as compared to Trucking are less like a change in script —or even a change in cast—and more like reassignments within the existing cast. Jason, Joe and Dan. Jr. all worked for Trucking and now they all work for Contracting. Dan Jr. continues to put together bids, though now he does them from his home office and with the help of his son and brother, not his father. His son Jason continues to work on site, but also does office tasks now that Barb is gone. Barb's husband Craig, however, *does* work for Contracting, and previously worked for Trucking. 29-3, PgID 610. The same goes for Vince Gomez. *Id.*[3] And some affiliates have not had a title change at all: Contracting uses the same CPA (Greenwood) and the same attorney (Lozano) that Trucking used to use. ECF 29-9, PgID 688–89; ECF 29-10, PgID 705.

---

[3] Dan Jr. conceded that Mike Samuelson and Andrew Bourdow may have also worked for both companies, ECF 32-4, PgID 1038, 1041, but to the extent the Court

Suffice it to say, there has not been a sea change in Bourdow family business endeavors. There has been change, and downsizing,[4] but the test in determining an alter ego is not whether precisely the same people maintained precisely the same jobs, but whether the operation of one company is "substantially identical" to another company. And the ultimate question is whether the new employer is "merely a disguised continuance of the old employer." *Fullerton*, 910 F.2d at 336. The operations factor therefore weighs in the Fund's favor.

### 4. Equipment

Trucking sold all of its assets as a result of its bankruptcy. The Fund has neither alleged nor provided evidence suggesting that Contracting purchased, retained, or acquired any of Trucking's equipment. The equipment factor therefore weighs in favor of Contracting.

### 5. Customers

As noted, Contracting's work is almost exclusively a subset of what Trucking used to do, and the two companies' customer bases are also similar. The Fund asserts that "[o]f the approximately twenty-two customers Bourdow Contracting serviced from 2013-2016, at least fifteen were former customers of Bourdow Trucking." ECF 32, PgID

---

reviews this factor as favoring the Fund, it must view the facts in a light most favorable to Contracting. As such, the ambiguous testimony is of no import to the Court.

[4] Although both companies' employment numbers depended upon workload, Trucking employed 15–30 people whereas Contracting employs 3–8 people. ECF 28, PgID 425.

971. Upon the Court's review, this may not be quite accurate, as several of Bourdow's listed clients are repeat customers.[5] Still, there is significant overlap.

Moreover, the territory that Contracting serves is entirely within Trucking's old territory: Trucking served most of the Lower Peninsula, and Contracting works exclusively within three counties in mid Michigan. ECF 31, PgID 840. Contracting's office is less than two miles from Trucking's old office—and essentially on the same street. Contracting's claim that the "geographic scope of Contracting's business is markedly different from that of Trucking," *id.*, is therefore accurate, insofar as a bullseye is markedly different from the target as a whole.

Contracting's name was also selected to appeal to the same customer base. Dan Jr. agreed it was "important for Bourdow Contracting to market itself using the Bourdow name", that people in mid Michigan "know the name Bourdow", and that Contracting got "more goodwill out of using the name Bourdow[.]" ECF 29-3, PgID 627. Joe likewise testified that Bourdow carried a lot of goodwill in mid Michigan specifically. ECF 29-4, PgID 657.

The customer factor weighs in the Fund's favor.

6. Supervision

Neither party provided a definition of "supervisor" as it pertains to Trucking and Contracting, but evidently it was or is a role in both entities. According to Dan Jr., Dan Sr. was the sole "supervisor" at Trucking and would delegate responsibilities to Dan Jr.

---

[5] The repetition of customers, however, may actually bolster the Fund's argument. Ace Saginaw, for instance, appears seven times, but was a former customer of Trucking, though under a different name. *See* ECF 29-11, ECF 29-4, PgID 653–54.

and Joe. ECF 29-3, PgID 608. Dan Sr. would decide which sites each person would go to, and then Dan Jr. and Joe would "direct out in the field." *Id.* At Contracting, Dan Jr., Joe, and Jason are all "supervisors." *Id.* at 613.

In the labor context, Congress has defined a "supervisor" as one who "in the interest of the employer" has the authority to "responsibly [] direct" employees, provided the direction "is not of a merely routine or clerical nature, but requires the use of independent judgment." 29 U.S.C. § 152. Under this definition, Dan Jr. and Joe were "supervisors" at Trucking, notwithstanding their subordinate position to Dan Sr. They have continued to supervise at Contracting. The only change in supervision has therefore been the substitution of Dan Sr. with Jason, albeit with a slightly different hierarchy. Because the on-site supervisors have essentially remained unchanged, the supervision factor weighs in the Fund's favor.

7. Ownership

There is no question that both Trucking and Contracting are exclusively Bourdow-family affairs, but the ownership interests have changed. Dan Sr. and Patricia owned more than half of Trucking, but have no ownership stake in Contracting. Dan Jr. and Joe each owned less than 10% of Trucking, but have 33% ownership stakes in Contracting. Jason owns the final third of Contracting, but had no ownership stake in Trucking. But to put it another way: the parties who owned roughly 20% of Trucking now own 66% of Contracting—and the rest of Contracting is owned by Dan Jr.'s son. There is thus significant, but not identical, overlap in the ownership of the two companies.

As with staffing, however, a mirror image of ownership interests is not necessary to find that one company is the alter ego of another. After all, the alter-ego doctrine is predicated on the possibility of employers "changing or altering their corporate form[s]." *Allcoast Transfer, Inc.*, 780 F.2d at 582. To that end, merely similar ownership can be instructive in determining whether companies are alter egos. *Cf. Michigan Laborers' Pension Fund v. Rite Way Fence, Inc.*, No. 13-CV-13727, 2015 WL 1885542, at *1 (E.D. Mich. Apr. 24, 2015) (finding a company owned solely by one defendant was the alter ego of a company where the defendant had a 60% interest). That Dan Jr. and Joe owned 20% of Trucking is therefore noteworthy.

The familial connection is also important. The Court has previously noted, "ownership by members of the same family may be considered in establishing common ownership." *Bricklayers Pension Tr. Fund–Metropolitan Area v. E&R Masonry Constr., Inc.*, No. 13-CV-14917, 2015 WL 12990250, at *3 (E.D. Mich. Mar. 31, 2015) (Murphy, J.) (collecting cases). A familial connection can weigh in favor of finding an alter ego, even when the individual owners of each company are distinct. *See id.* Here, not only are both companies owned entirely within one family, but two family members have had significant ownership stakes in both. In light of all this, the ownership factor weighs in favor of the Fund.

8.      Intent to Evade Labor Obligations

The Fund repeatedly insists that Dan Jr. and Joe formed Contracting with the intent and purpose of avoiding Trucking's withdrawal liability. *See, e.g.*, ECF 1, PgID 7; ECF 32, PgID 978. But other than the proximity of time between Trucking's end and

Contracting's beginning, the Fund has no evidence to support its claim. When viewing the evidence in a light most favorable to Contracting, the Court finds that the intent-to-evade factor weighs in favor of Contracting.

9.     Conclusion

In sum, though not every factor weighs in favor of the Fund, most do. Even when viewing all evidence in a light most favorable to Contracting, the fact remains that in comparison to Trucking, the company does the same work, in the same area, by operating in much the same way, and under the supervision of the same people. The same family has run both companies, and with a significant overlap of ownership. Although there is little evidence that the Bourdows formed Contracting with the intent to evade the obligations created by Trucking, this factor is not, on its own, determinative. *See Detroit Carpenters*, 581 F.3d at 319. The Court therefore finds that Contracting is the alter ego of Trucking.

II.     Successor Liability

The Fund raised an alternative argument that Contracting is a successor to Trucking under a "successor liability" theory. Contracting disputes the applicability of the theory to the facts here. Because the Court finds that the Contracting is the alter ego of Trucking, it need not address the argument.

III.     Withdrawal Liability

The Court must now assess what liability Contracting has incurred. Contracting insists that notwithstanding a finding of alter-ego status, no liability may be imposed because (1) the Fund's "claim for withdrawal liability is [] barred by the construction

industry exemption pursuant to 29 U.S.C. § 1383(b)", (2) the Fund "has no witness to support the amount of the withdrawal liability assessment or the assessment itself", and (3) "Trucking has and continues to dispute the amount of the assessment[.]" ECF 31, PgID 854.

A.    The Construction Exception

As noted above, a construction-industry employer is exempt from withdrawal liability unless it "ceases to have an obligation to contribute under the plan," yet "continues to perform work in the jurisdiction of the collective bargaining agreement of the type for which contributions were previously required," or "resumes such work within 5 years after the date on which the obligation to contribute under the plan ceases, and does not renew the obligation at the time of the resumption." 29 U.S.C. § 1383(b)(2).

Contracting's sole argument is that "Trucking went out of business" and its "operation and work was not assumed or performed by Contracting within the area jurisdiction of Trucking's collective bargaining agreement." ECF 31, PgID 855. But the Court has already found that Contracting is the alter ego of Trucking. Contracting is therefore "merely a disguised continuance" of Trucking. *Fullerton Transfer & Storage Ltd.*, 910 F.2d 331, 336 (6th Cir. 1990) (quoting *Southport Petroleum, Co. v. N.L.R.B.*, 315 U.S. 100, 106 (1942)). There is no question that Trucking and Contracting have collectively continued or resumed work within five years of when Trucking's contribution obligations ceased. And as explained above, Contracting continues to do the same work in the same region. The construction exemption therefore does not apply.

B.    The Amount of the Assessment

Contracting's final arguments challenge the amount of the assessment itself. According to Contracting, because the Fund did not provide a witness to support the amount of the withdrawal liability assessment and because Trucking actually disputes the assessment amount, it would be inappropriate for the Court to impose the amount asserted by the Fund—$1,272,187.06.[6]

Disputes over withdrawal-liability amounts must be resolved through arbitration, 29 U.S.C. § 1401(a)(1), and there is a strict, statutory timeline. After an employer's complete or partial withdrawal, the plan sponsor must—as soon as practicable—notify the employer of the amount of the liability, the schedule for liability payments, and demand payment in accordance with the schedule. 29 U.S.C. § 1399. The employer then has 90 days to "ask the plan sponsor to review any specific matter", "identify any inaccuracy" or "furnish any additional relevant information to the plan sponsor." 29 U.S.C. § 1399(b)(2)(A). Then, after "a reasonable review of any matter raised, the plan sponsor shall notify the employer" of its decision, the basis for the decision, and "the reason for any change in the determination of the employer's liability or schedule of liability payments." 29 U.S.C. § 1399(b)(2)(B). The deadline for initiating arbitration is based upon whether and when each of the foregoing events occurs. *See* 29 U.S.C. § 1401(a)(1). If an employer fails to initiate arbitration, it waives its defenses. *Palladium*, 722 F. Supp. 2d at 875 (citing 29 U.S.C. § 1401(b)(1)).

---

[6] This is the amount demanded in the Complaint, but as explained below, it is different from the amount demanded in the motion for summary judgment. *See infra* Part V.

Here, the Fund sent the notice letter on August 27, 2012. ECF 32-9, PgID 1106. But Trucking never initiated arbitration, and its "bankruptcy estate paid the Fund $52,033.98 as compensation" for its $1,272,187.06 proof of claim. ECF 33, PgID 1259; ECF 29-18, PgID 795–96. Trucking and its alter ego Contracting have waived any defense challenging the amount of withdrawal liability. The amount demanded in the August notice letter is therefore controlling.

IV.    The Effect of the Bankruptcy

One final matter remains: the effect of Trucking's bankruptcy and the Fund's claim in that proceeding. After Trucking filed for bankruptcy, the Fund filed a claim for the withdrawal-liability funds it currently seeks. Trucking eventually emerged from bankruptcy, having discharged its withdrawal-liability debt, among others. The Fund has now established that Trucking and Contracting are alter egos, i.e., they are the same entity. *See Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. v. Aguirre*, 410 F.3d 297, 302 (6th Cir. 2005) ("a contention that *A* is *B*'s 'alter ego' asserts that *A* and *B* are *the same entity*[.]") (quoting *Bd. of Trustees, Sheet Metal Workers' Nat'l Pension Fund v. Elite Erectors, Inc.*, 212 F.3d 1031, 1038 (7th Cir. 2000)). So the question is: was the debt discharged as to Contracting, since it is the alter ego? Having reviewed the parties' supplemental briefing, the Court concludes that the debt is not discharged as to Contracting and that the Fund has standing to pursue the unpaid portion of the funds.

First, the claim for withdrawal liability is the property of the Fund, not the bankruptcy estate. "[I]f the debtor could have raised a state claim at the commencement

of the bankruptcy case, then that claim is the exclusive property of the bankruptcy estate and cannot be asserted by a creditor," but "if the cause of action does not explicitly or implicitly allege harm to the debtor, then the cause of action could not have been asserted by the debtor as of the commencement of the case, and thus is not property of the estate." *In re Van Dresser Corp.*, 128 F.3d 945, 947 (6th Cir. 1997) (quoting *Schertz-Cibolo-Universal City, Indep. Sch. Dist. v. Wright* (*In re Educators Group Health Trust*), 25 F.3d 1281, 1284 (5th Cir. 1994)). Here, there was no harm to the debtor (Trucking). Rather, the harm (unpaid withdrawal liability) was caused *by* the debtor, and no legal theory would have permitted Trucking to sue Contracting—or itself—for not paying its own withdrawal liability. Accordingly, the instant claim belongs to the Fund, not the bankruptcy estate.

Second, Trucking's bankruptcy discharge is not a bar to the Fund recovering the withdrawal-liability funds from Contracting. To begin, "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt." 11 U.S.C. § 524(e). Although the Court has found that Contracting is the alter ego of Trucking, it does not follow that the two are therefore identically situated in all legal respects. Rather, the alter-ego doctrine is a means by which the Court can find one party directly—rather than vicariously—liable for the obligations of another party. *See Aguirre*, 410 F.3d at 302. Had Contracting and Trucking jointly owed a debt on a conventional loan that was discharged as to Trucking via its bankruptcy, the Court's alter-ego finding would not obliterate Contracting's continuing obligation to pay the debt. The same goes for withdrawal liability. The Fund attempted to recover, through the

bankruptcy process, the full amount of withdrawal-liability funds ($1,272,187.06) but walked away with only $52,033.98. ECF 29-18, PgID 795. Because Contracting is "substantially identical" to Trucking, the Fund is permitted to pursue the remainder from Contracting under an alter-ego theory.

V.    Award

The Court will enter judgment in favor of the Fund, but must first determine the appropriate award. The Complaint demands $1,272,187.06—the same amount claimed by the Fund during the bankruptcy ECF 1, PgID 12; ECF 29-18 PgID 795. But the motion for summary judgment seeks $1,163,279.00, which is the original amount demanded in the notice letter. ECF 29, PgID 522; ECF 29-8, PgID 679. The motion also seeks interest and fees pursuant to 29 U.S.C. § 1132(g)(2). And as noted, Trucking already paid $52,033.98 pursuant to the bankruptcy. *See* ECF 29-18, PgID 795–96.

In light of all this, the Court will permit each party to submit briefing, not to exceed seven pages each, on the appropriate amount of damages.

## ORDER

**WHEREFORE**, it is hereby **ORDERED** that Defendant's Motion for Summary Judgment [28] is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Summary Judgment [29] is **GRANTED.**

**IT IS FURTHER ORDERED** that each side shall **FILE** its brief on damages on or

before February 21, 2018.

**SO ORDERED**.

s/Stephen J. Murphy, III
STEPHEN J. MURPHY, III
United States District Judge

Dated: February 6, 2018

I hereby certify that a copy of the foregoing document was served upon the parties
and/or counsel of record on February 6, 2018, by electronic and/or ordinary mail.

s/David P. Parker
Case Manager